THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
MICHAEL THOMAS, Defendant-Appellant.

First District (4th Division)   No. 1—89—0454

Opinion filed April 23, 1992.

Randolph N. Stone, Public Defender, of Chicago (Michael Davidson and Vicki Rogers, Assistant Public Defenders, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb and David Stabrawa, Assistant State's Attorneys, of counsel), for the People.

JUSTICE McMORROW delivered the opinion of the court:

Following a bench trial, defendant was convicted of multiple counts of criminal sexual assault, aggravated criminal sexual assault, kidnapping, and aggravated kidnapping, one count of unlawful restraint and one count of aggravated battery. Judgment was entered on eight counts of aggravated criminal sexual assault, three counts of aggravated kidnapping, aggravated battery and violation of parole. Defendant received concurrent sentences of 12 years' imprisonment on each of aggravated kidnapping and aggravated criminal sexual assault convictions, five years for aggravated battery and three years for violation of parole. On appeal, defendant contends that the evidence was not sufficient to prove him guilty beyond a reasonable doubt on five of the counts of aggravated criminal sexual assault; that one count of aggravated kidnapping should be vacated; and that he is entitled to a new sentencing hearing.

At trial, the victim, T.W., testified that she was 15 years of age when the offenses occurred, on March 30, 1987. Defendant, then age 17, had been her boyfriend between August 1986 and late February 1987, when she broke off the relationship. At approximately 5 p.m. on the date of the crimes, she was home alone in the second-floor apartment where she lived with her family. The doorbell rang, and when

she went downstairs to answer it, she saw Myron Holmes, whom she knew through defendant. Defendant then appeared, and when she attempted to close the door, Holmes pulled it open and defendant stepped into the entranceway. T.W. informed defendant that she was not allowed to have company when she was home alone. T.W. then went upstairs to answer the telephone. Defendant and Holmes followed her up to the apartment. Defendant told her that he needed to talk to her, but she repeated that she was not allowed visitors. The telephone rang again, and as she turned to answer it, defendant grabbed her by the hair and the back of her neck. He then retrieved her coat and shoes from her bedroom, forced her to put them on and told her to come with him because he wanted to talk to her.

They exited the building and walked down the street with Holmes in front and defendant holding her arm and pushing her from behind. After an attempt by T.W. to run away, defendant held her by her neck as they continued walking until they reached the Fila Club. The door was locked but when defendant knocked, someone let them inside. T.W. had never been there before, but described it as a bar and dance club. Defendant led her through the bar area to a room in the rear where the dance floor was located. Defendant knocked on that door and asked the person who opened it if he could use the room for a while. After the person left, defendant gave T.W. the note she had written him a month earlier severing their relationship and told her to read it aloud. After she read it, he tore it into bits and told her to "eat her words." When she refused to eat the paper, he slapped her in the face, forced the papers into her mouth and ordered her to swallow them. She eventually complied after being slapped again by defendant.

Defendant next told her to undress and then went to a small boiler room from where he brought out a woolen item, which may have been a coat. He threw the coat on the floor near a chair and repeated his order that T.W. undress. After she did, he sat on the chair and ordered her to perform oral sex on him. When she refused, he pushed her down onto the coat and engaged in forced vaginal and then anal intercourse with her. Defendant then unlocked the door and told some men in the bar area that they could do whatever they wanted to her. Holmes came into the room and said he wanted T.W. to perform oral sex. When she refused, defendant slapped her and forced her to comply.

After Holmes left the room, defendant removed a barbecue fork from a cabinet and placed it on a heating plate. He also brought out a splintered wooden mop or broomstick with which he threatened to

anally assault her. Someone came to the door and spoke with defendant. Defendant then returned the splintered broom to the closet and brought out a different broomstick which he placed against the chair between her legs. Next, he took the fork from the heater and, holding her down, burned her with it on the left side of her chest, explaining that the burn marks would give her "something to remember [him] by," and stating that he "should be branding his name in [her] chest." When she kicked him away, defendant came back toward her and "pushed the stick and it hit [her] vagina." He then grabbed her and burned her right shoulder and chest with the hot fork.

When Holmes came in and told defendant that T.W.'s cousins had learned she was there, defendant directed T.W. to dress. He then took T.W. to a store across the street. When a store cashier asked T.W. why she was crying, defendant slapped her, ordered her to "shut up" and told the cashier to "stay out of it." Defendant led her to a telephone and instructed her to call her family and give them false information of her whereabouts. She tried but was unable to relay the information to her sister because she was still crying.

Defendant then took her to a third-floor apartment where a man unlocked the door and a set of burglar bars to let them inside and then relocked the door and bars. Defendant led her to the living room and then left for awhile. While he was gone, T.W. fell asleep on the couch. When defendant returned, he covered her with a blanket he had brought back, and apologized to her, explaining that his actions stemmed from her rejection of him and his jealousy. T.W. then falsely told defendant that she was pregnant in the hope that he would not hurt her again. Defendant nevertheless ordered T.W. to undress and engage in sex with him, threatening to kill her if she refused. The following morning, defendant took T.W. to a bus and allowed her to return home.

It was stipulated that defendant told a police detective that he did not have sex with T.W. but that he did inflict the burns. The assistant State's Attorney who later took a statement from defendant testified that defendant admitted having sex with T.W. but stated that she consented because she was his ex-girlfriend and was trying to "get back with him." Defendant denied burning T.W. in his statement to the attorney.

Defendant testified that he had gone to T.W.'s house to borrow a television he had given her as a gift. She told him that she could not have visitors, but would go with him to his house as long as she was home before her mother returned. They went to the Fila Club, where defendant worked as a disk jockey. T.W. had been there with him on

two or three prior occasions. There were a few people in the front, so they went to the rear area where their conversation escalated into an argument concerning defendant's sexual involvement with one of T.W.'s friends. The argument lasted only 10 minutes and was not violent. Defendant denied committing any of the acts described by T.W. in her testimony. After leaving the Fila Club, they went to a store and then to the apartment of a friend named Carl where T.W. agreed to spend the night with him. He left the apartment three times, on one occasion for three hours. When he returned, they had a long conversation in which she told him that she was pregnant. They spent the night together and had consensual intercourse. The following morning, he took T.W. to a bus stop and put her on a bus which took her home.

■■ We turn first to defendant's contention that his conviction of aggravated kidnapping as charged in count XIX of the indictment should be vacated. His position is that the basis of count XIX was the commission of criminal sexual assault, which convictions had been vacated by the court on the ground that they had merged into his convictions of aggravated criminal sexual assault. He further asserts that count XIX was duplicative of count XVIII, which charged him with aggravated kidnapping based upon aggravated criminal sexual assault. The State agrees with defendant's contention. Consequently, defendant's conviction and sentence for aggravated kidnapping based upon criminal sexual assault as charged in count XIX of the indictment are vacated.

■ We next consider defendant's contention that he was not proven guilty of those of the counts of aggravated criminal sexual assault based upon sexual penetration of T.W. with a broomstick. Defendant argues that there was no evidence of sexual penetration. We are constrained to agree.

In order to obtain a conviction of criminal sexual assault, the State must prove the occurrence of sexual penetration. (Ill. Rev. Stat. 1989, ch. 38, par. 12—13.) Sexual penetration by means other than bodily contact by the offender with the sex organ of the victim includes "any intrusion, however slight, of any *** object *into* the sex organ *** of another person." (Emphasis added.) Ill. Rev. Stat. 1989, ch. 38, par. 12—12(f).

In the present case, T.W. testified that defendant placed the broom or mop stick against the chair between her legs and then held her down and burned her. After kicking defendant away, he came back toward her and, in her words, "pushed the stick and it hit my vagina." This testimony does not establish an intrusion into her sex

organ as is required to establish penetration with an object. Consequently, defendant's convictions and sentences on those counts of aggravated criminal sexual assault based upon sexual penetration by a broomstick must be vacated. See *People v. Kelly* (1989), 185 Ill. App. 3d 43, 540 N.E.2d 1125.

Defendant also contends that his convictions of three counts of aggravated criminal sexual assault predicated on the burning of T.W. must be reversed because the burns were not inflicted "during the commission of a criminal sexual assault" (Ill. Rev. Stat. 1989, ch. 38, par. 12—14(a)(2)). Defendant argues that an injury or bodily harm which is not sufficiently linked to a sexual assault cannot serve as the aggravating factor underlying the charge of aggravated criminal sexual assault. (*People v. Boyer* (1985), 138 Ill. App. 3d 16, 485 N.E.2d 460.) He maintains that the evidence here established that the acts of burning T.W. occurred after the acts of sexual assault rather than during their commission and therefore cannot be used as the basis for aggravated criminal sexual assault charges.

This same issue was raised and addressed in *People v. Colley* (1989), 188 Ill. App. 3d 817, 544 N.E.2d 812, and *People v. White* (1990), 195 Ill. App. 3d 463, 552 N.E.2d 410. In *Colley*, the defendant entered the victim's home during the night and committed various acts of sexual assault. He thereafter demanded money, and when she denied having any, he hit her in her eye, briefly placed a pillow over her face and then cut her neck and chin with a pocket knife. A jury found the defendant guilty of aggravated criminal sexual assault and armed robbery. On appeal, he argued that he could not be convicted of aggravated criminal sexual assault because the stabbing occurred too long after the sexual acts to be considered part of the same course of conduct.

The *Colley* court noted that the stab wounds were inflicted soon after completion of the sexual acts and held that they were sufficiently close in time to those acts so that they could be found to have been committed during the course of the sexual assault. The court stated it would "not draw a bright line between the ending of the sexual acts and the bodily harm occurring afterward, as that would defeat the statutory purpose of protecting victims from sex offenders." *Colley*, 188 Ill. App. 3d at 820.

The reasoning and holding in *Colley* was expressly followed by the court in *White*. In that case, the defendant hit the victim several times and ripped off her nightgown. He then followed her upstairs where he sexually assaulted her. The court found that the period between the beating and the sexual assault was sufficiently close so as

to support a finding that it was committed in the course of a sexual assault.

■ Similarly, in the present case, the evidence presented established that defendant forced T.W. to accompany him to a dance club where he engaged in a course of conduct which began with slapping her and forcing her to eat paper. He then compelled her to disrobe and sexually assaulted her, following which he forced her to submit to another sexual act with an individual, Holmes, whom defendant had invited into the room. When Holmes left the room, defendant removed a long fork from a cabinet and placed it on a hot plate. He also produced a broom with a splintered handle and threatened to anally assault her with it. Immediately after another brief interruption by someone who came to the room, defendant used the hot fork to "brand" T.W., who was still naked, on her left and right chest areas and left shoulder. After burning T.W., defendant forced her to accompany him out of the dance club and eventually took her to a friend's apartment where, she testified, additional acts of sexual assault occurred.

The burnings of T.W. were part of an unbroken series of events and were both very near in time and closely linked to the forced sexual acts. These burnings were sufficient to support the charges and convictions of aggravated criminal sexual assault based upon the infliction of bodily harm during the commission of a criminal sexual assault. The case of *People v. Boyer* (1985), 138 Ill. App. 3d 16, 485 N.E.2d 460, on which defendant relies, is factually and analytically distinguishable in that the issue was whether there was sufficient evidence that the sexual assault victim sustained bodily harm or injury. In the case before us, T.W.'s injuries were proven by both testimonial and photographic evidence.

■ Defendant's final contention is that he is entitled to a new sentencing hearing. Citing *People v. Alejos* (1983), 97 Ill. 2d 502, 455 N.E.2d 48, he argues that the trial court may have been influenced by the convictions which we have found necessary to reverse, and that the remaining sentences may have been improperly enhanced as a result. In *Alejos*, the supreme court ordered a new sentencing hearing because the record established that the trial judge expressly referred to and improperly relied on a factor which served as the basis for a conviction which was subsequently reversed in imposing sentence on the remaining conviction.

Defendant in this case does not point to anything in the trial court's remarks, nor from our review of the transcript have we found anything, to support his hypothesis. The court made no specific refer-

ence to the number of convictions or the nature of those which have been reversed. In imposing sentences, the trial judge noted that defendant committed the crimes against his former girlfriend out of anger at her decision to sever their relationship. The judge also remarked upon the nature and extent of the "branding" of T.W. by defendant. The judge then concluded that this was not a case in which minimum sentences were appropriate, as the defense requested; but he also declined to impose extended terms, as sought by the State, or even the maximum allowable terms. Rather, he imposed concurrent sentences of 12 years, a term 18 years less than the maximum for Class X felonies (Ill. Rev. Stat. 1989, ch. 38, par. 1005—8—1) of which aggravated criminal sexual assault is one. The decision of the sentencing judge will not be disturbed absent a showing that it was an abuse of discretion (*People v. Perruquet* (1977), 68 Ill. 2d 149, 368 N.E.2d 882), which we do not find in this case.

In accordance with our rulings herein, the judgment of the trial court is affirmed in part and reversed in part.

Affirmed in part; reversed in part.

JIGANTI, P.J., and LINN, J., concur.