2022 IL App (2d) 200029-U
No. 2-20-0029
Order filed March 2, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Lake County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 18-CF-1496 |
| OSCAR CALDERON, | ) ) ) | Honorable Daniel B. Shanes, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE HUDSON delivered the judgment of the court.
Justices Schostok and Birkett concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Defendant was properly convicted of aggravated criminal sexual assault where the evidence established that, during the commission of the offense, he acted in such a manner as to threaten the life of the complainant.

¶ 2    Following a jury trial in the circuit court of Lake County, defendant, Oscar Calderon, was convicted of three counts of aggravated criminal sexual assault (720 ILCS 5/11-1.30(a)(2), (a)(3) (West 2018)). The trial court sentenced defendant to three terms of 10 years' imprisonment and ordered the sentences to run consecutively. On appeal, defendant argues that this court should reduce his conviction of aggravated criminal sexual assault based on section 11-1.30(a)(3) of the

Criminal Code of 2012 (Criminal Code) (720 ILCS 5/11-1.30(a)(3) (West 2018)) to criminal sexual assault because the evidence was insufficient to prove that, during the commission of the offense, he acted in such a manner as to threaten the life of the victim or any other person. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4     Defendant's convictions stem from events occurring on the evening of July 1, 2018, and the early morning hours of July 2, 2018, during which G.H. was sexually assaulted at her home. On July 25, 2018, a grand jury returned a 22-count indictment against defendant. At trial, the State proceeded on counts 7, 8, 11, 12, 15, 16, 17, and 18 of the indictment. Counts 17 and 18 were home invasion charges (720 ILCS 5/19-6(a)(2), (a)(6) (West 2018)). The remaining counts charged defendant with aggravated criminal sexual assault under multiple theories (720 ILCS 5/11-1.30(a)(2), (a)(3) (West 2018)). The matter proceeded to a jury trial at which the following evidence was presented.

¶ 5     G.H. testified that she had known defendant for about nine years. She and defendant previously dated and had a daughter together in 2011. By July 2018, the two had not been romantically involved for five or six years, but they remained in touch. G.H. resided in a house in unincorporated Waukegan. G.H. testified that defendant had visited her home multiple times to help with household chores and socialize.

¶ 6     On July 1, 2018, G.H. worked the 9 a.m. to 9 p.m. shift at her job as a certified nursing assistant. She and defendant had texted each other during the day. When G.H. left work, she picked up a friend from his job at a pizzeria. Defendant texted and called G.H. over two dozen times after she finished work, but she did not respond.

¶ 7    After G.H. picked up her friend, she drove home to change clothes. G.H. arrived home sometime between 11 and 11:20 p.m. G.H. told her friend to stay in the car while she went inside to change. G.H. walked to the front door to enter the house. G.H. testified that as she unlocked the door, defendant grabbed her from behind, pushed her into the house, and entered the house uninvited. In the living room, defendant asked G.H. why she had not returned his calls. G.H. testified that defendant sounded worried at first, but became angry after she asked him to leave. Defendant refused to leave and stood by the front door. G.H. tried to leave the house, but defendant blocked her access to both the front and back doors.

¶ 8    G.H. retreated to the bathroom to escape defendant, but he managed to enter the room with her before she could shut the door. G.H. took her phone from her purse to call the police, but defendant grabbed it from her. According to G.H., defendant noticed her lipstick was smeared and asked her what she had been doing. G.H. tried to leave the bathroom, but she was unable to get past defendant because he pushed her back. After a second attempt to leave the bathroom, defendant grabbed G.H. by the ankles and pulled, causing her to fall to the bathroom floor on her back. G.H. testified that once she was on the floor, defendant ripped off her clothes, got on top of her, and said, "if you're not going to give it to me, then I'm going to take it." G.H. testified that defendant raped her on the bathroom floor by putting his finger and penis inside her vagina. Defendant stopped when he noticed G.H. was bleeding from her vagina. According to G.H., defendant then stood up and started hitting himself in the face, saying "I'm stupid."

¶ 9    G.H. said she used this as an opportunity to get up from the floor, grab her phone, and run for the bedroom. G.H. testified that defendant followed, catching her in the hallway, where he pushed her against a door, choked her, and said, "should I kill you right now?" G.H. testified that

she managed to push defendant away and ran into her bedroom. Defendant entered the bedroom before she could close the door.

¶ 10    In the bedroom, G.H. threw her torn clothing into a trash can and changed clothes. G.H. told defendant to leave, promising that she would not call the police, but he refused. G.H. tried to leave the room, but defendant blocked the door, telling her that she was not going anywhere. G.H. threw a glass vase at defendant, after which defendant pushed G.H. onto the bed, removed her shorts, and raped her again with his penis. G.H. testified that she cried during the assault, telling him to stop and to get off her. G.H. said defendant continued assaulting her, telling her to stop crying and faking, remarking "you know you like it."

¶ 11    G.H. testified that after the assault ended, defendant began pacing in the bedroom. He then said, "we're not leaving here tonight," and told G.H. he was going to kill them both. Defendant then left the bedroom for the kitchen, where G.H. heard him rummaging through the drawers. Based on defendant's statements, G.H. thought defendant was looking for a knife. As defendant ran back to the bedroom, G.H. slammed the door on defendant's hand. After defendant freed his hand, G.H. shut the bedroom door completely and refused to let him back in. G.H. heard defendant leave the house through the front door. She then called 9-1-1 from her bedroom at about 12:35 a.m.

¶ 12    G.H. told 9-1-1 dispatcher Monika Reum to send help because she had just been raped by her child's father. Reum alerted the sheriff. During the call, G.H. said someone was knocking on the front door and she was worried it was defendant trying to get inside again to kill her. She also mentioned that her leg was hurt. The State introduced a redacted version of the 9-1-1 call at trial.

¶ 13    On cross-examination, G.H. denied that she tried to pick up pieces of glass from the broken vase to cut herself or that defendant expressed concern that she was going to cut herself.

¶ 14    Lake County Sheriff's deputy William King and his partner responded to the 9-1-1 call. When King arrived at G.H.'s house, he found defendant on the front lawn with his hands in the air. Defendant had on a shirt and shoes, but was not wearing any pants. King handcuffed defendant and placed him in the squad car pending an investigation. King then spoke to G.H. inside the house after Reum assured her that it was the police at the door. Paramedics arrived a short time later. After an initial assessment, the paramedics took G.H. to Condell Hospital for an examination. King took defendant to the Lake County Sheriff's Office.

¶ 15    Meanwhile, another sheriff's deputy, evidence technician Rebecca Loeb, processed the scene. Loeb photographed the interior and exterior of the house and recovered several items, including the clothes G.H. had been wearing, the shorts and underwear defendant left behind in the bedroom, defendant's cell phone, and a butter knife.

¶ 16    At the sheriff's office, Detectives Andrew Markoya and his partner interrogated defendant at about 3 a.m. on July 2. Markoya testified at trial that during the interrogation, he collected defendant's shirt, took his fingerprints, and obtained a buccal swab sample for DNA. The detectives recorded the interrogation, and the State introduced about 70 minutes of the video footage at trial.

¶ 17    During the interrogation, defendant said he and G.H. stopped dating in 2013, but he believed she loved him and wanted to marry him. Defendant admitted going to G.H.'s house on his bicycle that night because G.H. had not responded to his calls or texts, which gave him a gut feeling that she was cheating on him. He said he waited 60 to 90 minutes in the bushes for G.H. to arrive. Defendant admitted that he snuck up on G.H. at the front door, which initially scared her, but said he entered the house with her permission.

¶ 18    Defendant told the detectives that he and G.H. got "fussy" in the living room, and she soon walked to the bathroom. He followed her there, turned on the bathroom light, and saw smeared lipstick on her face. Defendant admitted this made him angry and jealous, and he told the detectives multiple times that he "fucked up." The two began arguing, and defendant began searching G.H.'s body for "hickeys," ripping her top and scratching her breasts in the process. Defendant told detectives he started kissing G.H. and then made a "hickey" on the right side of her neck and fondled her breasts. Defendant said G.H. liked this and did not push him away as he did it. Defendant told detectives he undressed G.H. and himself in the bathroom.

¶ 19    Defendant said the two briefly made their way into the hallway but then returned to the bathroom because G.H. tried to leave. Defendant closed the bathroom door, then took G.H.'s cell phone when she mentioned wanting to call her grandmother. Defendant said he grabbed G.H. by her legs, below the knees, and the two fell to the floor with him on top of her. Defendant said they had sex on the floor for three to four minutes until G.H. said she was hurt.

¶ 20    When the sexual encounter in the bathroom ended, defendant said G.H. started screaming and walked to the bedroom. Defendant told detectives he followed G.H. there, where she told him to leave because he had raped her. Defendant said he tried to calm down G.H., but she continued screaming, saying she wanted to call her grandmother and the police. Defendant claimed that G.H. grabbed a brush and started rubbing her forearm with it. Defendant said he thought the brush was a knife, so he grabbed G.H. in a bear hug and told her to stop. After letting go, G.H. broke the vase. Defendant thought G.H. was going to cut herself with the glass.

¶ 21    Defendant said that after about a half hour together in the bedroom, he and G.H. had sex again for about 10 to 15 minutes. Defendant initially told detectives that the two fell onto the bed together after he hugged her for comfort, but then said he picked up G.H., put her on the bed, and

proceeded to have sex with her until she screamed and said she was in pain, at which time he stopped.

¶ 22    Defendant said G.H. "lost it" after the sex stopped. In response, defendant told her he was going to kill them both, which he acknowledged had scared her. Defendant admitted that he "fucked up" by making the threat. Defendant said he then went to the kitchen, which probably led G.H. to believe he was getting a weapon. Defendant said G.H. slammed his hand in the bedroom door. After freeing his hand, defendant said he grabbed a small knife to open the bedroom door, but left the house after hearing G.H. call 9-1-1. Defendant said he got only a few houses away before deciding to turn around. Once back at G.H.'s house, he knocked on the front door and pretended to be from the Waukegan Police Department. Defendant insisted that he and G.H. had consensual sex that night.

¶ 23    While the detectives interrogated and processed defendant, medical staff at Condell Hospital stabilized G.H. Registered nurse Karen Stramich, a certified sexual assault nurse examiner (SANE), performed a SANE examination of G.H. and administered a rape kit at about 7 a.m. on July 2. During the examination, G.H. told Stramich that defendant had pushed her into her house, sexually assaulted her in the bathroom and bedroom with his penis and fingers, and threatened to kill both of them. According to Stramich, G.H. also told her that defendant was upset because she had not returned his phone calls. Stramich noted scratches on G.H.'s neck, shoulders, back, chest, arms, wrists, and knees. Stramich also identified a bruise on G.H.'s neck. Stramich photographed these injuries. Stramich did not observe any injuries to G.H.'s vagina, but identified a tinge of blood from a vaginal swab she took. Detective Markoya collected and inventoried the completed rape kit.

¶ 24    Later, during the course of the investigation, the Northeast Illinois Regional Crime Laboratory performed latent fingerprint and DNA analyses on some of the evidence. The parties stipulated that defendant's prints matched a latent print found on the recovered butter knife. A forensic biology analyst identified blood on the vaginal swabs and defendant's shirt, as well as amylase on G.H.'s neck swab. The lab performed Y-STR DNA analysis on the vaginal swab and obtained a partial profile from at least one male contributor. Forensic analyst Sarah Owen opined that defendant or his paternal male relatives could not be excluded as a contributor to the partial profile.

¶ 25    Defendant testified in his own defense at trial. Defendant told the jury that he spoke to and texted G.H. several times on July 1, 2018. Defendant called G.H. multiple times after she left work, but he was unable to reach her. Defendant decided to go to G.H.'s house that day because he feared she was going to harm herself in light of some distressing recent developments in her life. Defendant rode his bicycle to G.H.'s home to see if she was there. G.H. did not answer the door when defendant arrived, and he noticed that her car was gone. Defendant acknowledged this meant G.H. was not inside the house with a medical emergency, but he decided to wait until she returned. Unlike his statement to detectives, defendant denied waiting in the bushes.

¶ 26    Defendant stated that it was 45 minutes to an hour before G.H. arrived. Defendant said he "shocked" G.H. at her front door, and stated that he asked permission to enter the house. According to defendant, G.H. gave a non-verbal response that he interpreted to be a yes. Defendant admitted following G.H. into the bathroom. Defendant initially testified he went to the bathroom because he sensed something was wrong. Defendant said he temporarily took the phone away from G.H. because she was threatening to call her grandmother and he wanted her to calm down first.

¶ 27    Defendant further testified that when he entered the bathroom, he noticed that G.H.'s lips were swollen and red. Defendant asked G.H. what had happened, but she kept quiet. Defendant said G.H. then "allowed" him to touch her hand and waist by not reacting to him. G.H. was briefly mad at defendant for asking about her lips, but calmed down. Defendant then undressed her. Defendant testified that G.H. did not resist, and the two then had sex on the floor. Defendant testified that he and G.H. then went into the bedroom, where the pair continued kissing and proceeded to have sex again. Defendant testified that the sexual relations he had with G.H. were consensual.

¶ 28    Defendant testified that when he and G.H. finished having sex in the bedroom, G.H. threw the vase and tried to cut her arms with the broken glass. Defendant said he tried to calm down G.H. and went to the kitchen to get some water. After he heard the bedroom door slam, defendant grew worried that G.H. was going to harm herself. When G.H. refused to let defendant back into the bedroom, he tried to open the bedroom door with a sandwich knife, but he was unsuccessful. Defendant said he decided to leave the house after he heard G.H. calling 9-1-1 from the bedroom. He got only a few houses away before deciding to go back to G.H.'s house. Defendant testified that when he saw the police approach him, he put up his hands, laid down, and identified himself.

¶ 29    On cross-examination, defendant admitted that he got angry in the bathroom, took G.H.'s phone, and refused to let her leave the bathroom. Defendant also admitted ripping open G.H.'s shirt and inspecting her breasts because he was mad that she had supposedly cheated on him. Defendant acknowledged that after having sex on the bathroom floor, a visibly upset G.H. said, "you raped me" and told him to get out. Nevertheless, defendant testified that, after the incident in the bathroom, he and G.H. had consensual sex in the bedroom.

¶ 30 The jury convicted defendant of three of the aggravated criminal sexual assault counts: (1) count 7, which alleged that defendant, by the use of force or threat of force, placed his penis in G.H.'s sex organ while in the bathroom and caused bodily harm in violation of section 11-1.30(a)(2) of the Criminal Code (720 ILCS 5/11-1.30(a)(2) (West 2018)); (2) count 12, which alleged that defendant, by the use of force or threat of force, placed his penis in the sex organ of G.H. while in the bedroom and acted in a manner that threatened the life of G.H. in violation of section 1.30(a)(3) of the Criminal Code (720 ILCS 5/11-1.30(a)(3) (West 2018)); and (3) count 15, which alleged that defendant, by the use of force or threat of force, placed his finger in the sex organ of G.H. and caused bodily harm in violation of section 11-1.30(a)(2) of the Criminal Code (720 ILCS 5/11-1.20(a)(2) (West 2018)). The jury acquitted defendant of the home invasion counts and the remaining aggravated criminal sexual assault counts. The trial court sentenced defendant to 10 years' imprisonment for each of the three convictions, with the sentences to be served consecutively. Defendant filed a timely notice of appeal, which was subsequently amended by the Office of the State Appellate Defender.

¶ 31                                II. ANALYSIS

¶ 32 A person commits criminal sexual assault when he or she "commits an act of sexual penetration by the use of force or threat of force." 720 ILCS 5/11-1.20(a)(1) (West 2018). The offense of aggravated criminal sexual assault occurs when a person commits criminal sexual assault and an aggravating circumstance existed. 720 ILCS 5/11-1.30(a) (West 2018). The aggravating circumstance at issue in this appeal is found in section 11-1.30(a)(3) of the Criminal Code, which provides that the offense of criminal sexual assault is elevated to aggravated criminal sexual assault if, during the commission of the offense, the accused "acts in a manner that threatens or endangers the life of the victim or any other person." 720 ILCS 5/11-1.30(a)(3) (West 2018).

¶ 33     On appeal, defendant challenges his conviction of aggravated criminal sexual assault as charged in count 12 of the indictment. According to defendant while the evidence was sufficient to establish that he committed a criminal sexual assault in G.H.'s bedroom, the State failed to prove the aggravating factor that, during the commission of the offense, he acted in such a manner to threaten the life of G.H. or any other person. Defendant's argument in this regard is twofold. First, he asserts that any verbal threat he made in the bedroom to kill G.H. and himself was unaccompanied by any overt act and therefore insufficient to prove the aggravating circumstance alleged in count 12. Second, defendant contends that even if his verbal threat in the bedroom to kill G.H. and himself constituted an overt act so as to threaten or endanger G.H.'s life, his statement occurred *after*, not during, the criminal sexual assault in the bedroom. For these reasons, defendant contends that this court should reduce his conviction of aggravated criminal sexual assault based on count 12 to criminal sexual assault and remand the matter for resentencing.

¶ 34     The State counters that defendant was proven guilty beyond a reasonable doubt of aggravated criminal sexual assault as charged in count 12 of the indictment. The State reasons that defendant's actions in pinning G.H. to the door in the hallway, choking her, and threatening to kill her while she was fleeing from him to her bedroom after the sexual assault in the bathroom constituted the aggravating factor that, during the commission of the offense, he acted in a manner that threatened the life of G.H. As such, the State urges us to affirm defendant's conviction of aggravated criminal sexual assault based on count 12 of the indictment.

¶ 35     Before proceeding further, we note that the parties dispute the applicable standard of review. Defendant argues that the issue raised presents a mixed question of law and fact. In this regard, defendant asserts that the jury's factual findings are reviewed under the deferential standard set forth in *Jackson v. Virginia*, 443 U.S. 307, 315-16 (1979). However, citing *People v. Giraud*,

2012 IL 113116, defendant asserts that whether he threatened G.H.'s life during the commission of the offense is a question of statutory interpretation, which is subject to *de novo* review. Thus, according to defendant, this court must first review the statute *de novo* before applying the *Jackson* standard to the jury's finding. In contrast, the State contends that the typical sufficiency of the evidence standard applies as defendant is challenging "whether the facts in this particular case proved the overt act and threat or endangerment necessary to establish the aggravated offense." We agree with defendant.

¶ 36    At issue in *Giraud* was whether a defendant's act of knowingly exposing the victim of a sexual assault to HIV, thereby placing her at some risk of acquiring an infection that could eventually lead to her developing an incurable and potentially fatal disease, constituted a threat or endangerment of her life during the commission of the offense. *Giraud*, 2012 IL 113116, ¶ 6. The supreme court determined that this issue presented a question of statutory interpretation, subject to *de novo* review. *Giraud*, 2012 IL 113116, ¶ 6. The supreme court explained that "[i]f the circumstance alleged by the State to be a threat or endangerment of the victim did not exist during the commission of the offense, it cannot, as a matter of law, be used to elevate the crime from criminal sexual assault to aggravated criminal sexual assault." *Giraud*, 2012 IL 113116, ¶ 11. In this case, defendant challenges the existence of the aggravating circumstance during the commission of the offense and the sufficiency of the evidence in regard to the aggravating circumstance. We review the former issue *de novo*. *Giraud*, 2012 IL 113116, ¶¶ 6, 11. We then apply our analysis to the State's evidence to determine whether, considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson*, 443 at 318-19; *People v. Brown*, 2013 IL 114196, ¶ 48.

¶ 37    Turning to the merits, defendant argues that his conviction of aggravated criminal sexual assault based on count 12 of the indictment must be reduced to criminal sexual assault. Count 12 of the indictment alleged that defendant committed the offense of aggravated criminal sexual assault in that defendant, "while in the bedroom of" G.H.'s residence, "knowingly committed an act of sexual penetration with [G.H.], in that by the use of force or threat of force *** defendant placed his penis in the sex organ of [G.H.], and *** defendant acted in a manner that threatened the life of [G.H.]." Defendant admits that there was evidence that, following the sexual assault in the bedroom, he threatened to kill both himself and G.H. He also admits that there was evidence that he pushed G.H. onto the bed prior to the sexual assault in the bedroom. According to defendant, however, these acts were insufficient to prove that, during the commission of the offense, he acted in a manner that threatened the life of G.H. because G.H. did not claim to have sustained any physical injury as a result of his overt act of pushing her onto the bed and his verbal threat alone was insufficient to prove the aggravating circumstance. In support of his position, defendant relies principally upon *People v. Singleton*, 217 Ill. App. 3d 675 (1991).

¶ 38    In *Singleton*, the defendant was charged with aggravated criminal sexual assault with the aggravating circumstance being that he acted in such a manner as to threaten or endanger the life of the victim. The evidence at trial showed that the defendant had a pattern of domestic violence against his wife and children. During one incident, after the victim (the defendant's daughter) refused to have sexual intercourse with the defendant, he told her he would kill her if she did not comply. The victim went into the bedroom and when she hesitated, the defendant pushed her onto the bed before committing a sexual assault. After the assault, defendant told the victim that he would kill her if she told anyone about what he had done. Based on this evidence, the jury found defendant guilty of aggravated criminal sexual assault. On appeal, the defendant argued that the

evidence failed to show that his actions during the commission of the offense, *i.e.*, the verbal threat that he would kill the victim coupled with the act of pushing the victim onto the bed, threatened or endangered the victim's life. The *Singleton* court held that the State must show that it was the "overt acts by the defendant, and not verbal threats, which endanger[ed] or threaten[ed] a victim's life, and that the life-threatening acts *** occur[ed] during the commission of the offense." *Singleton*, 217 Ill. App. 3d at 687. The *Singleton* court concluded that none of the prior acts of abuse had occurred at the time of the sexual assault. *Singleton*, 217 Ill. App. 3d at 687. The court further determined that the defendant's overt act of pushing the victim onto the bed could not be viewed as a life-threatening act because there was no evidence that the victim sustained any type of physical injury as a result. *Singleton*, 217 Ill. App. 3d at 687. As a result, the *Singleton* court reduced the defendant's conviction from aggravated criminal sexual assault to criminal sexual assault. *Singleton*, 217 Ill. App. 3d at 687.

¶ 39 Defendant argues that, pursuant to *Singleton*, a verbal threat alone is insufficient to prove the aggravating factor that the accused "acted in a manner that threatens or endangers" the victim's life. *Singleton*, 217 Ill. App. 3d at 687. However, more recently in *Giraud*, the supreme court stated that "to act in a manner that threatens a victim, the offender must communicate the threat to the victim by *word or deed*." (Emphasis added.) *Giraud*, 2012 IL 113116, ¶ 15. This statement from *Giraud* suggests that words alone would suffice to prove the aggravating circumstance as set forth in section 11-1.30(a)(3) of the Criminal Code. However, we need not address whether defendant's words alone after the assault in the bedroom sufficed to prove the aggravated circumstance at issue here. As noted earlier, the State contends that it was defendant's actions of pinning G.H. to the door in the hallway, choking her, and threatening to kill her while she was fleeing to her bedroom after the first sexual assault in the bathroom that constituted the aggravating circumstance at issue.

Defendant contests the State's position, asserting that the actions in the hallway were insufficient to establish the aggravating circumstance in count 12 because they were not contemporaneous to the assault in the bedroom.

¶ 40    In determining whether defendant's actions in the hallway occurred "during the commission" of the offense in the bedroom, we find instructive a line of cases beginning with *People v. Colley*, 188 Ill. App. 3d 817 (1989). In *Colley*, the victim testified that she had awoken during the night to find the defendant standing naked over her bed. The defendant sexually assaulted the victim in her bedroom. The defendant then got up and rummaged through the victim's dresser. The victim told the defendant that she did not have any money. The victim then asked to use the bathroom. The defendant accompanied the victim to the bathroom, and after she was done, he hit her in the eye and told her that he would kill her if she did not give him some money. The victim reiterated that she did not have any money. At that point, the defendant threw the victim on the bed and placed a pillow over her face. After a minute, the defendant released the victim and instructed her to go downstairs. While in the kitchen, the defendant cut the victim on the neck and chin with a pocketknife. A jury found the defendant guilty of aggravated criminal sexual assault with the aggravating circumstance being that the defendant caused bodily harm to the victim. See Ill. Rev. Stat. 1987, ch. 38, par. 12-14(a)(2).[1] On appeal, the defendant in *Colley* argued that he could not be convicted of aggravated criminal sexual assault because the victim's stab wounds provided the only evidence of bodily harm and they occurred too long after the sexual acts were completed to be considered part of the same course of conduct. The reviewing court rejected the

---

[1] Section 12-14(a)(2) was amended and renumbered to section 11-1.30(a)(2) of the Criminal Code (720 ILCS 5/11-1.30(a)(2) (West 2018)) by Public Act 96-1551 (eff. July 1, 2011).

defendant's arguments, concluding that the stab wounds had occurred "sufficiently close in time to the sexual acts that they can be said to have been committed during the course of the sexual assault." *Colley*, 188 Ill. App. 3d at 820. In so holding, the court refused to draw a bright line between the ending of the sexual acts and the bodily harm occurring afterward, "as that would defeat the statutory purpose of protecting victims from sex offenders." *Colley*, 188 Ill. App. 3d at 820.

¶ 41    In *People v. White*, 195 Ill. App. 3d 463 (1990), the defendant and the victim lived together. On the evening of the offense at issue, the couple was fighting. The victim went upstairs to bed. A few minutes later, the defendant came up and began arguing with the victim. The victim told the defendant that she did not want to argue and that she was going to get her purse and go for a drive. The defendant followed her down the stairs and into the kitchen. The victim testified that when she reached for her purse, the defendant hit her a few times. Further, as the victim made her way to the front door, the defendant ripped off her nightgown. The defendant allowed the victim to go upstairs to put something on. However, when the victim got to the bedroom, the defendant who had followed her, pushed her down on the bed and sexually assaulted her. A jury found the defendant guilty of aggravated criminal sexual assault with the aggravating circumstance being that the defendant caused bodily harm to the victim. See Ill. Rev. Stat. 1987, ch. 38, par. 12-14(a)(2). On appeal, the defendant argued for the reversal of his conviction of aggravated criminal sexual assault because the bodily harm that served as the aggravating factor for the offense was not inflicted during its commission but rather occurred prior to it and in a different location. Relying on *Colley*, the *White* court concluded that "the period between the beatings and the sexual assault was sufficiently close so that the beatings could be found to have been committed during the commission of the sexual assault." *White*, 195 Ill. App. 3d at 467.

¶ 42    In *People v. Thomas*, 234 Ill. App. 3d 819 (1992), the defendant and the victim were in a relationship until the victim broke it off. Approximately one month after the break up, the defendant forced the victim to go to a club. At the club, the defendant took the victim to a private room where he told the victim to read the break-up letter she had written him. After the victim read the letter, the defendant tore it up and told her to "eat her words." When the victim refused to eat the paper, the defendant slapped her in the face, forced the papers into her mouth, and ordered her to swallow them. The victim complied after being slapped again by the defendant. The defendant then took the victim to a boiler room where he sexually assaulted her. The defendant also forced the victim to submit to a sexual act by a person he had invited into the room. The defendant then burned the victim several times with a hot fork before taking her to another location and sexually assaulting her again. The defendant was convicted of various offenses, including aggravated criminal sexual assault with the aggravating circumstance being that the defendant caused bodily harm to the victim. Ill. Rev. Stat. 1989, ch. 38, par. 12-14(a)(2). On appeal, the defendant argued that his aggravated criminal sexual assault convictions should be reversed because the burnings occurred after the sexual assaults rather than during their commission and therefore could not be used as a basis for the aggravated criminal sexual assault charges. The *Thomas* court disagreed, stating that the burnings "were part of an unbroken series of events and were both very near in time and closely linked to the forced sexual acts." *Thomas*, 234 Ill. App. 3d at 825. As such, the court held that the burnings were sufficient to support the convictions of aggravated criminal sexual assault based upon the infliction of bodily harm during the commission of a criminal sexual assault. *Thomas*, 234 Ill. App. 3d at 825.

¶ 43    In *People v. Lamon*, 346 Ill. App. 3d 1082 (2004), the defendant and the victim had been in a long-term relationship which had ended prior to the events at issue. On the night in question,

the defendant made an unannounced visit to the victim's residence where the defendant grabbed the victim by her hair, called her a "whore," accused her of cheating, urinated on her, and tied her up. The defendant also told her not to scream and that if she did not comply, she "would not live to see the next day." The defendant then struck the victim several times with a wire coat hanger before sexually assaulting her. The jury convicted the defendant of aggravated criminal sexual assault with the aggravating circumstance being that the defendant caused bodily harm to the victim. See 720 ILCS 5/12-14(a)(2) (West 2002). On appeal, the defendant argued that the victim's testimony was insufficient to establish that he had committed aggravated criminal sexual assault because the State did not prove that the bodily harm was contemporaneous to the criminal sexual assault. Relying on *Colley*, the court rejected the defendant's argument, remarking that it was "not the order in which the forced intercourse and assault occurred, but that [the] defendant sexually assaulted the victim and the infliction of the bodily injury occurred during or as a part of the commission of the forcible rape." *Lamon*, 346 Ill. App. 3d at 1091.

¶ 44     Although *Colley* and the other cases discussed above involved subsection (a)(2) of the aggravated criminal sexual assault statute, we find the analyses in those cases persuasive as the "during the commission of the offense" language interpreted therein also applies to subsection (a)(3). These cases teach that to sustain a conviction under section 11-1.30(a)(3) of the Criminal Code, a defendant's acts threatening or endangering the life of the victim or any other person may occur either before or after the sexual assault, but they must be sufficiently close in time and closely linked to the sexual acts for them to be considered as having been committed "during the commission of the offense." *Lamon*, 346 Ill. App. 3d at 1091; *Thomas*, 234 Ill. App. 3d at 825; *White*, 195 Ill. App. 3d at 467; *Colley*, 188 Ill. App. 3d at 820; see also *Singleton*, 217 Ill. App. 3d

at 687 (holding that the aggravating circumstance "must occur at the time of the commission of the offense or so close to the time of the occurrence as to be an inseparable part of the offense").

¶ 45    As noted, it is the State's position that it was defendant's actions in pinning G.H. to the door in the hallway, choking her, and threatening to kill her while she was fleeing from defendant to her bedroom after the first sexual assault in the bathroom that constituted the aggravating circumstance that, during the commission of the offense, defendant acted in such a manner to threaten the life of the complainant. According to defendant, the evidence presented at trial fails to prove the aggravating factor in count 12 because the events in the hallway were "not so close in time to the bedroom assault" that they can be said to have been committed during the course of the sexual assault in the bedroom. We agree with the State. G.H. testified that after defendant sexually assaulted her in the bathroom, she ran towards the bedroom. Defendant followed G.H., catching her in the hallway, where he pushed her against a door, choked her, and said, "should I kill you right now?" G.H. pushed defendant away and ran to her bedroom. Defendant followed. In the bedroom, G.H. threw her torn clothing into a trash can and put on another outfit. G.H. told defendant to leave, promising that she would not call the police, but he refused. G.H. tried to leave the room, but defendant blocked the door, telling her that she was not going anywhere. After G.H. threw a glass vase at defendant, he pushed G.H. onto the bed, removed her shorts, and sexually assaulted her again. Based on this record, we conclude that defendant's actions in the hallway and the assault in the bedroom were part of an unbroken series of events and were very near in time and closely linked. Thus, the circumstance alleged to be a threat to the victim existed during the commission of the offense in the bedroom and can be used to elevate the offense as charged in count 12 from criminal sexual assault to aggravated criminal sexual assault. See *Giraud*, 2012 IL 113116, ¶ 11; see also *People v. Porrata*, 244 Ill. App. 3d 529, 536 (1993) (holding that beating

inflicted by the defendant prior to and in a different location than the sexual assault "occurred and existed during the commission of the offenses"); *White*, 195 Ill. App. 3d at 467 (holding that the period between the beatings and the sexual assault, which occurred in different locations in the victim's house, was sufficiently close so that the beatings could be found to have been committed during the commission of the sexual assault); *Colley*, 188 Ill. App. 3d at 818-20 (holding that stab wounds sustained in kitchen following sexual assault in bedroom occurred sufficiently close in time to the sexual acts to have been committed during the course of the sexual assault).

¶ 46    Moreover, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime as charged in count 12 beyond a reasonable doubt. *Jackson*, 443 U.S. at 318-19; *Brown*, 2013 IL 114196, ¶ 48. In this regard, defendant concedes that the evidence was sufficient to prove criminal sexual assault. Further, we determine that the evidence was sufficient to prove that defendant's actions in the hallway— pinning G.H. to the door, choking her, and threatening to kill her—constituted actions which threatened G.H.'s life.

¶ 47    Defendant suggests that *Giraud*, 2012 IL 113116, imposes a stricter reading of the phrase "during the course of the offense" than the cases we discuss above. According to defendant, the *Giraud* court refused to extend the time horizon for the overt threatening act beyond the time involved in the actual commission of the crime. We disagree. In *Giraud*, the defendant was charged with aggravated criminal sexual assault with the aggravating circumstance being that the defendant knew he was HIV positive and had forcible intercourse with the victim without wearing a condom. The supreme court reversed the defendant's conviction of aggravated criminal sexual assault because the "mere exposure" of the victim to HIV during the commission of the offense did not threaten or endanger the victim's life. *Giraud*, 2012 IL 113116, ¶ 39. To threaten the victim's life,

the court reasoned, the defendant would have had to communicate to the victim at the time of the assault that he was HIV positive. *Giraud*, 2012 IL 113116, ¶¶ 14-16. To endanger the victim's life, the victim would have had actually be infected with HIV during the assault—the victim, however, was never infected with HIV. *Giraud*, 2012 IL 113116, ¶¶ 33-35. Contrary to defendant's argument, the *Giraud* court did not hold that a defendant's actions that occur close in time to the offense could not be considered an aggravating factor. Rather, *Giraud* was concerned with the fact that no threat was communicated during the offense and the victim's life was not endangered during the offense. *Giraud*, 2012 IL 113116, ¶ 39. We therefore do not read *Giraud* as a limitation on the *Colley* line of cases that an aggravating circumstance may be close in time to the underlying offense.

¶ 48    Defendant also insists that count 12 "limited the physical space of the charged acts to the bedroom at G.H.'s house" and that because the choking episode did not happen in the bedroom it could not serve as the aggravated circumstance for the sexual assault in the bedroom. However, defendant cites no authority in support of this proposition. Thus, it is forfeited. Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) (requiring the appellant's brief to contain the contentions of the appellant and the reasons therefor, with citation of the authorities and the pages of the record relied on); *People v. Soskin*, 2021 IL App (2d) 191017, ¶ 39 (holding that the failure to comply with rules requiring that a party raise arguments and provide citation to legal authority or the record results in forfeiture); *Gakuba v. Kurtz*, 2015 IL App (2d) 140252, ¶ 19 (holding that party forfeited contention by failing to support his argument with citations to relevant authority); *Hall v. Naper Gold Hospitality, LLC*, 2012 IL App (2d) 111151, ¶ 12 ("Mere contentions, without argument or citation to authority, do not merit consideration on appeal.").

¶ 49 Defendant also claims that the State's position on appeal differs from the one it took at trial. In this regard, defendant argues that, during closing argument, the State "emphasized the death threat made in the bedroom, albeit after the assault was over, in asserting that it had proven the aggravating factor for Count 12." However, as defendant readily acknowledges in his reply brief, the State also argued during closing argument that the hallway encounter served as the threatening act for the bedroom assault charged in count 12. Defendant cites no authority for the proposition that it was improper for the State to advance multiple theories at trial.

¶ 50 In sum, for the reasons set forth above, we conclude that defendant's actions in the hallway prior to the sexual assault in the bedroom were part of an unbroken series of events and were very near in time and closely linked. Thus, the acts in the hallway were committed "during the commission of the offense" in the bedroom. Moreover, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime as charged in count 12 beyond a reasonable doubt. Accordingly, we decline defendant's request to reduce his conviction of aggravated criminal sexual assault based on section 11-1.30(a)(3) of the Criminal Code to criminal sexual assault.

¶ 51                                III. CONCLUSION

¶ 52 For the reasons stated, we affirm the judgment of the circuit court of Lake County.

¶ 53 Affirmed.