2025 IL App (1st) 231115-U

THIRD DIVISION
June 18, 2025

No. 1-23-1115

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | No. 21 CR 1912 |
| | ) | |
| SHINAR JOHNSON, | ) | Honorable |
| | ) | Carol M. Howard, |
| Defendant-Appellant. | ) | Judge Presiding. |
| | ) | |

_____

JUSTICE REYES delivered the judgment of the court.
Justices Martin and D.B. Walker concurred in the judgment.

**ORDER**

¶ 1     *Held*:   Affirming the judgment of the circuit court of Cook County convicting the defendant of aggravated criminal sexual assault and aggravated domestic battery; rejecting defendant's one-act, one-crime challenge.

¶ 2     Defendant Shinar Johnson was charged with repeatedly physically and sexually assaulting his girlfriend, P.Y.,[1] during a four-day period from December 25 through December 28, 2020.  Following a bench trial in the circuit court of Cook County, defendant was

_____

[1] We refer to P.Y. by her initials to protect her privacy.  *People v. Munoz-Salgado*, 2016 IL App (2d) 140325, ¶ 1 n.1.

convicted of multiple counts of aggravated criminal sexual assault (720 ILCS 5/11-1.30 (West 2020)) and aggravated domestic battery (720 ILCS 5/12-3.3 (West 2020)) and was sentenced to an aggregate term of 38 years in prison.

¶ 3 Defendant advances three primary arguments in this direct appeal. He initially contends that the State failed to prove beyond a reasonable doubt that he committed aggravated criminal sexual assault on December 25, 2020. According to defendant, there was insufficient evidence of any sexual penetration and no evidence that he used a dangerous weapon during the commission of the offense. Defendant next asserts that the State failed to prove beyond a reasonable doubt that he committed aggravated criminal sexual assault on December 27, 2020. He maintains that the DNA evidence was "too weak" and there was no evidence that he committed aggravated domestic battery during the commission of the offense. Finally, defendant challenges one of his convictions under the one-act, one-crime doctrine. As discussed below, we affirm the judgment in its entirety.

¶ 4 BACKGROUND

¶ 5 *Indictment*

¶ 6 In a 35-count indictment, defendant was charged with aggravated criminal sexual assault, aggravated battery, battery, and unlawful restraint. The State ultimately proceeded on 10 counts of sexual assault (counts 1, 2, 5, 6, 9, 10, 13, 15, 16, and 19), four counts of aggravated domestic battery (counts 23, 24, 27, and 30), and one count of domestic battery (count 32). The remaining counts were nol-prossed prior to trial.

¶ 7 *Bench Trial*

¶ 8 The testimony and other evidence presented during the bench trial which commenced in February 2023 included the following.

¶ 9                                            P.Y.

¶ 10    P.Y. testified that she dated defendant for approximately four years, beginning in 2017. In December 2020, defendant and P.Y. resided in an apartment in the 700 block of East 79th Street in Chicago.

¶ 11    P.Y. was initially questioned regarding events which occurred from December 25, 2020, through December 28, 2020. She testified that on December 25, 2020, defendant forced her to perform both oral and vaginal sex. According to P.Y., defendant gripped and squeezed her neck and pierced her skin with his nails, as she was "not giving him oral correctly." She then testified that he hit her with a phone charger cord "[e]verywhere" on her body.

¶ 12    P.Y. testified that defendant forced her to perform oral sex on the following day, December 26, 2020. After again complaining that she was not "doing it correctly," defendant hit her "[f]ace, head, body, legs, [and] arms." When asked what he used to hit her, P.Y. testified, "Like the usual, cord, of course, his hands." P.Y. further testified that he used his knee to strike her vaginal area, causing her significant pain.

¶ 13    According to P.Y., defendant again forced her to perform oral sex on December 27, 2020. He stuck his penis in her mouth and struck her when she was not performing to his satisfaction. P.Y. also testified that defendant used a cigarette to burn her nipples. On the evening of December 27, 2020, defendant gave P.Y. sleeping pills (which she took), and she fell asleep.

¶ 14    P.Y. was awakened on December 28, 2020, by defendant shaking her and requesting oral sex. When she hesitated, he placed his penis in front of her mouth. She again hesitated, and he inserted his penis in her mouth. After P.Y. performed oral sex for five or six minutes, defendant stated she was "doing it wrong" and began hitting her. He smacked her face with his hand, punched her in the eye, shoved her to the ground, kicked her face, chest, back, and legs,

and then repeatedly struck her with a phone charger cord.

¶ 15    After hitting her with the cord, defendant stated he would be "right back."  According to P.Y., defendant set up his laptop computer, logged into Facebook Messenger, and directed her to sit in front of the camera and not move.  P.Y., who was naked at the time, initially complied with his instructions.  Defendant exited from the apartment, barricading the door with "a chair, some poles, [and a] broom handle stick."  P.Y. remained in the apartment alone, without access to a landline or mobile telephone.  Defendant was able to monitor P.Y. in the apartment through Facebook Messenger, and P.Y. was also able to view defendant.

¶ 16    When P.Y. observed that defendant had walked down the block, she slammed the laptop closed, grabbed her coat and jeans, and ran out of the apartment building.  She was not wearing a shirt, undergarments, or shoes at the time.  P.Y. was stopped by two individuals who contacted emergency services and remained with her until assistance arrived.

¶ 17    P.Y. spoke to a police officer while in an ambulance at the scene and was transported to the University of Chicago Medical Center, where a sexual assault examination was performed.  While hospitalized for almost two weeks, P.Y. was treated for extensive injuries.  Her orbital bones (*i.e.*, the bones of the eye socket) required surgical repair, and she sustained certain vision loss due to her injuries.  The trial court was presented with photographs of P.Y.'s injuries as of December 28, 2020, including photographs of hook-shaped cord markings on her back and open wounds on her neck.

¶ 18    P.Y. testified that she did not recall using drugs during the few days before she ran from the apartment, although she acknowledged smoking crack cocaine in the past.  Upon questioning by the assistant state's attorney (ASA), she admitted that she smoked crack cocaine at 6 a.m. or 7 a.m. on the morning of her trial testimony.  At the time of her testimony regarding her drug

use—approximately 3:30 p.m.—P.Y. denied that she was "under the influence" or that her earlier drug use affected her recollection.

¶ 19   In accordance with the trial court's ruling on a motion *in limine* regarding other-crimes evidence, the ASA questioned P.Y. regarding multiple past incidents involving defendant. On an unspecified date in December 2018, defendant inserted his penis in P.Y.'s vagina while she was initially asleep; he hit, choked, and kicked her.  P.Y. also testified that he choked her and hit her in the eye and ear on July 21, 2019.  The trial court was presented with photographs of P.Y.'s injuries from that incident, including a bloodied eye and an open wound below her eye. P.Y. testified that in the early morning hours of August 12, 2019, defendant slapped, punched, and kicked her while wearing steel-toe shoes.  Photographs from that date depict P.Y.'s injuries, including her "cauliflower ear," *i.e.*, a deformity of the external ear resulting from blunt trauma.

¶ 20   During cross-examination, P.Y. admitted that she had overdosed on crack cocaine the previous month.  She testified that she and defendant had been using crack cocaine during prior incidents, including the incident on August 12, 2019.  Defense counsel questioned P.Y. regarding her statement to a treating physician that she had used cocaine on December 27, 2020.  P.Y. was also questioned regarding her prior recorded statement to an ASA that defendant had burned both her nipples and vagina (as opposed to her nipples only).

¶ 21   Defense counsel further questioned P.Y. regarding a series of events allegedly involving her neighbors in November and December 2020.  P.Y. received medical treatment at a hospital on November 28, 2020.  When speaking with a police officer at the hospital, P.Y. stated that she had been approached at an ATM four days earlier by a female neighbor, N.D.  P.Y. informed the officer that N.D. snatched money from her hand and forced P.Y. to enter the apartment N.D.

shared with her uncle, T.D.[2]  P.Y. then told the officer that N.D. and T.D. held her captive for three days and forced her to have sex with multiple partners.  P.Y. informed the officer that such activity commenced in May 2020.

¶ 22    On November 30, 2020, P.Y. appeared at a court hearing via Zoom to attempt to obtain a protective order against N.D. and T.D.  P.Y. testified under oath during the November 30 hearing that N.D. threatened P.Y., pushed her against a wall, slapped her in the face, and hit her with a cord when she disobeyed or resisted.  P.Y. further testified during the November 30 hearing that T.D. held her down and threatened her.

¶ 23    Defense counsel also questioned P.Y. regarding a conversation she had with a police detective when receiving medical treatment at a hospital on December 13, 2020.  P.Y. informed the detective that T.D. had on the previous day forced her by gunpoint to go to his apartment, where he hit, kicked, and sexually assaulted her.  A patient advocate spoke with P.Y. regarding her rights as a sexual assault victim, and a hospital employee offered to locate alternative housing for P.Y., which she apparently declined.  P.Y. testified that she did not inform any medical personnel that defendant had sexually assaulted or otherwise abused her.

¶ 24    During redirect examination, P.Y. testified that she had been afraid of defendant for years.  She testified that he previously hit her when she did not want to perform oral sex, and, on the dates at issue herein, she was afraid she would be hit again if she did not perform oral sex.  She admitted that she was never assaulted by T.D. or N.D. and had never entered their apartment.  When asked why she reported to the police that they had assaulted her, P.Y. testified: "Because [defendant] would come in and make assumptions that he's seen me in that apartment

---

[2] Given the sensitive nature of the seemingly false allegations against N.D. and T.D. (as discussed below), we identify them by their initials to protect their privacy.

and it was so repeated that once he made those assumptions, he would physically start hitting me and at that point, I felt like I didn't have a choice but to start saying it was true to stop the beatings." Prior to the court hearing on November 30, 2020, defendant told P.Y. to blame T.D. and N.D. for her injuries, even though defendant had injured her. P.Y. further testified that defendant sat next to her throughout her Zoom testimony on November 30. P.Y. also admitted that she lied at the hospital on December 13, 2020; she wanted treatment for her injuries, and defendant directed her to inform the authorities that T.D. and N.D. had caused them.

¶ 25                    Officer Andrea Diamond

¶ 26    Chicago Police Officer Andrea Diamond (Officer Diamond) testified that she and her partner responded to a call regarding a battery and kidnapping on December 28, 2020. Officer Diamond interviewed P.Y. as she was being treated by emergency medical technicians in an ambulance. According to Officer Diamond, P.Y. could "barely talk," her breathing was labored, and she appeared to be severely beaten.

¶ 27    Certain footage from Officer Diamond's body-worn camera was played for the trial court. Officer Diamond testified P.Y. relayed that defendant "began to beat her due to his accusations of her having sex with other people." During cross-examination, Officer Diamond confirmed that P.Y. never told her that defendant had beaten her "because he was dissatisfied with her oral sex performance."

¶ 28                    Donna Piludu

¶ 29    Donna Piludu (Piludu) testified that she worked as a nurse at the University of Chicago Medical Center in December 2020. At that time, she was in training to become a sexual assault nurse examiner (SANE), a nurse who provides care for a patient admitted with a complaint of sexual assault. The trial court found Piludu qualified as an expert witness in the field of sexual

assault examination and treatment.

¶ 30    When Piludu first met P.Y. on December 28, 2020, she observed that P.Y. had a "lot of swelling" around her head and ears.  P.Y. stated that she was exhausted and hungry, as she had not eaten in two days.  Piludu asked if P.Y. would consent to the administration of a criminal sexual assault kit.  While P.Y. was initially unwilling to consent to the full kit, she allowed Piludu to swab her mouth so she could eat and drink without obstructing any evidence collection.

¶ 31    On December 29, 2020, P.Y. agreed to the completion of the kit, including the collection of a vaginal swab.  Piludu and a physician assistant also performed a full body assessment of P.Y.  The injuries recorded by Piludu included scabbing on the top of P.Y.'s head; swelling and abrasions on both of her eyes; abrasions on her cheeks; ligature markings on her neck; a torn frenulum; whipping marks and burn marks; and a bite mark on her left elbow.  According to Piludu, certain whipping marks were fresh, and others were older.  Piludu testified she had an independent recollection of this case, as P.Y. "had so many marks from head to toe."

¶ 32    P.Y. informed Piludu that she was held captive and physically and sexually abused by defendant.  P.Y. described her physical abuse, including hitting, punching, slapping, choking, burning, knocking her head into a wall, hitting her with electrical cords, and throwing items at her.  As to the sexual abuse, P.Y. relayed to Piludu that defendant usually wanted oral sex.  P.Y. reported to Piludu that the last time that she and defendant had vaginal sex was on December 25, 2020, and the last time they had oral sex was on December 28, 2020.

¶ 33                                    Detective David Scarriot

¶ 34    Detective David Scarriot (Detective Scarriot) of the Chicago Police Department and his partner met with P.Y. at the hospital on January 1, 2021; he observed her extensive injuries, including "massive" head injuries and hook marks on her body at different stages of healing.

P.Y. told Detective Scarriot that defendant caused her injuries. A few days later, while still hospitalized, P.Y. identified and signed a photograph of defendant.

¶ 35 Detective Scarriot learned that defendant was in custody on January 12, 2021. In the months that followed, defendant placed various telephone calls from jail. Detective Scarriot listened to the recordings of these calls as part of his investigation; portions of certain calls were played for the trial court.

¶ 36 In one of the jailhouse calls, defendant stated "that's why I put hands on the ho." In a subsequent call, defendant relayed "[P.Y.] needs to be in court or I need her to make or fill out an affidavit, it only costs a dollar, to say that this never happened." He described P.Y. as a "turn off" and repeatedly relayed that he and P.Y. did not engage in sexual activity during the relevant time. He also represented, on separate occasions, "that is not my DNA on her" and "that is not my DNA coming out of that girl." During one call, he stated: "You know, yeah, I lost my mind a couple of times, but it was never no sexual s*** going on, excuse my language, it was never none of that. So, man, even your wife could be a character witness. She could say, hell, he slapped the girl up and broke her jaw, she could say *** what she know."

¶ 37                                    Angela Kaeshamer

¶ 38 Angela Kaeshamer (Kaeshamer), a forensic scientist with the Illinois State Police Forensic Science Center, was accepted as an expert witness in the field of forensic DNA analysis. She testified that DNA analysis was conducted on a buccal swab standard from defendant. Kaeshamer compared the standard from defendant to the DNA profile identified in P.Y.'s vaginal and oral swabs.

¶ 39 Kaeshamer explained that a "differential extraction" was performed in sexual assault samples to allow the separation of the non-sperm fraction from the sperm fraction. As to the oral

swab, Kaeshamer identified two contributors to the sperm fraction; one was presumably P.Y. Kaeshamer then compared the partial DNA profile of the second contributor to the DNA profile from defendant. She testified that defendant was included (*i.e.*, not excluded) and that approximately 1 in 2100 unrelated individuals would have the same profile. As to the sperm fraction from the vaginal swab, Kaeshamer compared the partial male DNA profile to defendant's DNA profile, and he was included. The frequency of that partial male DNA profile in the general population is approximately 1 in 850 trillion unrelated individuals.

¶ 40    During cross-examination, Kaeshamer confirmed that the profile from the oral swab described above was not a complete profile, *i.e.*, information was missing at 20 out of 23 locations. As to the vaginal swab, information was missing at 9 out of 23 locations. On redirect examination, Kaeshamer testified that it is estimated that semen could exist for up to seven days in a vaginal cavity and approximately two days in a living female's mouth.

¶ 41                                        S.E.

¶ 42    S.E., a former girlfriend of defendant, testified regarding an incident on May 19, 2008.[3] During a verbal argument, defendant pushed S.E.'s chest and placed one of his hands around the front of her neck, choking her. She called the police, and defendant was arrested. During cross-examination. S.E. testified that the charges against defendant were "dropped," at her request.

¶ 43                          *Convictions and Sentencing*

¶ 44    At the close of the State's evidence, the trial court denied defendant's motion for a directed finding, and the defense rested without presenting evidence. When issuing its ruling, the trial court opined that P.Y. "was not a good witness," as she appeared to be "high" during her

---

[3] We refer to S.E. by her initials to protect her privacy. See *Munoz-Salgado*, 2016 IL App (2d) 140325, ¶ 1 n.1. Her testimony was provided in accordance with the trial court's ruling on the State's motion *in limine* regarding other-crimes evidence.

testimony and admitted that she provided false testimony in another proceeding. The trial court found, however, that her testimony was corroborated by physical evidence, including the DNA evidence and the photographs which depicted she was "brutally beaten." The circuit court found defendant guilty of two counts of aggravated criminal sexual assault (counts 1 and 15), four counts of aggravated domestic battery (counts 23, 24, 27, and 30), and one count of domestic battery (count 32). Defendant was found not guilty on the remaining counts.

¶ 45    Defendant filed an original and supplemental motion for reconsideration and/or a new trial, which the trial court denied. Defendant was sentenced to consecutive prison terms of 16 years (on count 1), 15 years (on count 15), and 7 years (on count 23), for an aggregate sentence of 38 years. He was also sentenced to 10 years each on three aggravated domestic battery counts (counts 24, 27, and 30), to run concurrently with the 38-year sentence. The domestic battery conviction (count 32) merged into count 30. After the trial court denied defendant's motion to reconsider sentence, he filed this timely appeal.

¶ 46                                    ANALYSIS

¶ 47    Defendant raises three primary contentions on appeal. As to count 1, he argues that the State failed to prove beyond a reasonable doubt that he committed aggravated criminal sexual assault on December 25, 2020, as there was insufficient evidence of sexual penetration and no evidence that he used a dangerous weapon during the commission of the offense. As to count 15, defendant asserts that the State failed to prove beyond a reasonable doubt that he committed aggravated criminal sexual assault on December 27, 2020, given that the DNA corroboration was "too weak" and there was no evidence that he committed another felony during the commission of the offense. Finally, defendant maintains that his aggravated domestic battery conviction (count 23) should be vacated under the one-act, one-crime doctrine, as the

same conduct—burning P.Y.'s body—was "used both to elevate count 15 to an aggravated criminal sexual assault and to prove the elements of count 23 aggravated domestic battery."

¶ 48                                    *Count 1*

¶ 49    In count 1, defendant was charged with committing aggravated criminal sexual assault on December 25, 2020, under section 11-1.30(a)(1) of the Criminal Code of 2012.  Pursuant to section 11-1.30(a)(1), a person commits aggravated criminal sexual assault if he commits criminal sexual assault and, "during the commission of the offense," he "displays, threatens to use, or uses a dangerous weapon, other than a firearm, or any other object fashioned or used in a manner that leads the victim, under the circumstances, reasonably to believe that the object is a dangerous weapon."  720 ILCS 5/11-1.30(a)(1) (West 2020).  A person commits criminal sexual assault if he commits an act of sexual penetration and "uses force or threat of force."  720 ILCS 5/11-1.20(a)(1) (West 2020).  Count 1 of the indictment alleged contact between defendant's penis and P.Y.'s mouth by the use of force or threat of force and alleged that defendant used a "dangerous weapon, to wit: a cord."

¶ 50    Defendant argues on appeal that the State failed to prove beyond a reasonable doubt that he committed an act of oral sexual penetration upon P.Y. on December 25, 2020.  According to defendant, P.Y. was an unreliable witness based on her drug addiction, as well as her prior false testimony under oath against her neighbors, N.D. and T.D.  Defendant also contends that the guilty finding on count 1 "hinged" on the trial court's determination that the alleged penis-to-mouth contact on December 25 was corroborated by DNA evidence—a determination which defendant maintains was incorrect.  Finally, defendant asserts that the State failed to prove beyond a reasonable doubt that he used a dangerous weapon, *i.e.*, a cord, during the commission of the sexual assault.

¶ 51                                    General Principles

¶ 52    The standard of review for a challenge to the sufficiency of the evidence is well settled.

*People v. Pollock*, 202 Ill. 2d 189, 217 (2002).  When reviewing a challenge to the sufficiency of

the evidence, the relevant inquiry is "whether, after viewing the evidence in the light most

favorable to the prosecution, *any* rational trier of fact could have found the essential elements of

the crime beyond a reasonable doubt."  (Emphasis in original.)  *Jackson v. Virginia*, 443 U.S.

307, 319 (1979).  Accord *People v. Wheeler*, 226 Ill. 2d 92, 114 (2007); *People v. Cunningham*,

212 Ill. 2d 274, 278-79 (2004).  The same standard of review applies when reviewing the

sufficiency of the evidence in all criminal cases, regardless of whether the evidence is direct or

circumstantial, and regardless of whether the defendant received a bench or jury trial.  *Pollock*,

202 Ill. 2d at 217; *People v. Brown*, 2013 IL 114196, ¶ 48.

¶ 53    When reviewing the sufficiency of the evidence in a criminal case, all reasonable

inferences must be drawn in favor of the prosecution.  *People v. Jones*, 2023 IL 127810, ¶ 32.

This standard "does not allow a reviewing court to substitute its judgment for that of the trier of

fact on questions involving the weight of the evidence or the credibility of the witnesses."  *Id.*

See also *Wheeler*, 226 Ill. 2d at 114 (noting that the trier of fact is "best equipped to judge the

credibility of witnesses"); *People v. Ortiz*, 196 Ill. 2d 236, 259 (2001) (observing that the trier of

fact has the responsibility to "determine the witnesses' credibility and the weight to be given

their testimony, to resolve conflicts in the evidence, and to draw reasonable inferences from the

evidence").  The trier of fact is "not required to disregard inferences that flow normally from the

evidence before it, nor must the trier of fact search out all possible explanations consistent with

innocence and raise those explanations to a level of reasonable doubt."  *People v. Eubanks*, 2019

IL 123525, ¶ 95.  Accord *Jones*, 2023 IL 127810, ¶ 32.

¶ 54    In sum, a criminal conviction will not be reversed unless the evidence is so improbable or unsatisfactory as to justify a reasonable doubt as to the defendant's guilt. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 225 (2009).

¶ 55                              Evidence of Sexual Assault

¶ 56    Defendant maintains that the only evidence to support the allegation that sexual penetration occurred between his penis and P.Y.'s mouth by the threat or use of force on December 25, 2020, is her testimony that he forced her to perform oral sex that day. According to defendant, P.Y.'s testimony was not credible as she used crack cocaine, including on the morning of her trial testimony. He also maintains that P.Y. was an unreliable witness based on her admittedly false testimony in the separate case against her neighbors. As discussed below, we are not persuaded by these contentions.

¶ 57    Defendant relies on *People v. Herman*, 407 Ill. App. 3d 688 (2011), wherein the reviewing court reversed the defendant's convictions for aggravated criminal sexual assault and police misconduct. The reviewing court found that the testimony of the alleged victim—who was a "self-described crack cocaine addict"—was so flawed that it was "impossible for any fact finder reasonably to accept any part of it." *Id.* at 689, 709. Unlike the alleged victim in *Herman*, however, P.Y.'s testimony was not "fraught with inconsistencies and contradictions." *Id.* at 705. Rather, her testimony regarding the timeline and description of events was generally clear and was corroborated by other evidence presented to the trial court. For example, P.Y. testified, in part: "He put a nice grip around my neck and stuck his nails as deep as he could into my neck due to the fact that I was not giving him oral correctly." The medical evidence regarding her extensive injuries, including her open neck wounds and her torn frenulum—the connection between the tongue and the base of the mouth—was consistent with her account.

¶ 58    Defendant accurately observes that the State did not present DNA evidence proving that oral penetration occurred on December 25, 2020. As the forensic scientist (Kaeshamer) testified that semen could exist for approximately two days in a living female's mouth—and P.Y. was hospitalized and examined on December 28, 2020—the lack of DNA evidence as to the December 25 assault is unsurprising. Given that P.Y. was allegedly held captive for a four-day period from December 25 to December 28, 2020, we are hard-pressed to find that the absence of definitive DNA evidence as to the assault on the first day (December 25) is dispositive.

¶ 59    Although the testimony of an individual addicted to drugs "must be viewed with caution," such testimony may be sufficient to sustain a conviction "if credible in view of the surrounding circumstances." *People v. Steidl*, 142 Ill. 2d 204, 227 (1991). See also *People v. Ingram*, 91 Ill. App. 3d 1074, 1078 (1980) (noting that although there is "a need for close scrutiny" of an addict's testimony, "it may be sufficient to sustain the conviction if it is credible under the surrounding circumstances"). The surrounding circumstances in this case support P.Y.'s account of events, including her physical injuries from the relevant period and prior incidents, defendant's statements during jailhouse calls wherein he admitted committing abuse, and P.Y.'s appearance when she departed from their shared apartment. *E.g.*, *People v. Bounds*, 171 Ill. 2d 1, 43 (1995) (noting that the victim was found wearing only a T-shirt, which did not belong to her, and was naked from the waist down; finding that "[t]he absence of clothing is consistent with a sexual assault"). While P.Y. admittedly lied under oath during a Zoom hearing involving her neighbors, her explanation for her lack of candor was reasonable, especially given that defendant was seated next to her at the time.

¶ 60    As noted above, it is the function of the trier of fact to determine the weight to be given a witness's testimony. *Jones*, 2023 IL 127810, ¶ 32. In this case, we cannot find that any

deficiencies with respect to P.Y.'s testimony were so serious as to prevent a rational trier of fact from finding defendant guilty beyond a reasonable doubt as to count 1. See *People v. Garcia*, 2012 IL App (1st) 103590, ¶ 84 (noting that a complainant's testimony need not be "perfect" to sustain a conviction for sexual abuse).

¶ 61                                  Use of Weapon During Commission of Offense

¶ 62    Defendant alternatively argues that the State failed to prove beyond a reasonable doubt that he used a dangerous weapon, *i.e.*, a cord, "during the commission" of the criminal sexual assault on December 25, 2020. 720 ILCS 5/11-1.30(a)(1) (West 2020). While defendant does not contest that he used a cord on P.Y. "at some point" or that the cord was a dangerous weapon, he maintains that the State failed to prove that the cord was used "during the commission" of a sexual assault, as is required to elevate the offense to aggravated criminal sexual assault. Defendant thus contends that his conviction for aggravated criminal sexual assault in count 1 should be reduced to criminal sexual assault and the matter should be remanded for resentencing.

¶ 63    Defendant's argument centers on the phrase "during the commission of the offense," as used in the aggravated criminal sexual assault statute. According to defendant, this presents a question of statutory interpretation, subject to *de novo* review. *People v. Streater*, 2023 IL App (1st) 220640, ¶ 48; *People v. Smith*, 2019 IL App (1st) 161246, ¶ 24. But see *People v. Wilbourn*, 2024 IL App (1st) 230404-U, ¶ 26 (concluding that the question of "whether defendant committed actions that threatened or endangered anyone's life and whether those actions occurred during commission of the offenses are questions of fact concerning the sufficiency of the evidence, not matters of statutory interpretation"). Regardless of the applicable standard of review, our result herein is the same.

¶ 64    Defendant relies on our supreme court's decision in *People v. Giraud*, 2012 IL 113116.

16

The defendant in *Giraud* was convicted under a prior version of the aggravated criminal sexual assault statute. See 720 ILCS 5/12-14(a)(3) (West 2006). The aggravating factor found by the jury was that " 'during *** the commission of the offense,' " the defendant " 'acted in such a manner as to threaten or endanger the life of the victim' " (*id.*), because on at least one occasion, he had forcible intercourse with the victim without wearing a condom, knowing that he was HIV positive. *Giraud*, 2012 IL 113116, ¶ 1. Although the victim was exposed to HIV, she did not contract it. *Id.* ¶ 2. The appellate court reduced the conviction to criminal sexual assault, on the basis that the victim was neither threatened nor her life endangered during the assault. *Id.* ¶ 1.

¶ 65 The Illinois Supreme Court affirmed, finding that the "mere exposure" of the victim to HIV during the commission of the offense did not actually threaten or endanger her life. *Id.* ¶ 39. After noting that the aggravated criminal sexual assault statute lists possible aggravating circumstances, our supreme court opined that "[b]y the plain language of the statute, none of these circumstances can elevate the crime of criminal sexual assault to aggravated criminal sexual assault unless they existed while the crime was being committed." *Id.* ¶ 8.

¶ 66 In the instant case, after P.Y. testified that defendant gripped her neck on December 25, 2020, as she was "not giving him oral correctly," the ASA questioned whether defendant used a cord against P.Y.'s body. P.Y. responded that defendant hit her with a cord "[e]verywhere." When questioned regarding events on December 26, 2020, P.Y. similarly testified that defendant hit her with "the usual, cord, of course, his hands[,]" due to his dissatisfaction with her oral sex performance. P.Y. also testified that he shoved, punched, kicked, and hit her with a phone charging cord when he stopped her from performing oral sex on December 28, 2020, and stated she was "doing it wrong." The photographs from the ambulance on December 28, 2020, depict P.Y.'s back covered in hook-shaped marks, which she identified as "cord markings." Piludu also

described "whipping marks" on P.Y.'s body; some marks were healing, and others were fresh.

¶ 67    Defendant maintains that the striking with the cord occurred after the sexual act, and thus the aggravating factor did not "exist[] while the crime was being committed." *Giraud*, 2012 IL 113116, ¶ 8. We reject this contention. Considering all of P.Y.'s testimony, it is reasonable to infer that defendant struck her with the cord on December 25, 2020, when he was dissatisfied during the sexual act. See *Cunningham*, 212 Ill. 2d at 280 (providing that the "reviewing court must allow all reasonable inferences from the record in favor of the prosecution"). As this court has previously observed, "the 'offense' of criminal sexual assault does not begin and end at the fixed point in time of the sexual penetration." *Smith*, 2019 IL App (1st) 161246, ¶ 32. See also *Streater*, 2023 IL App (1st) 220640, ¶ 51 (stating that "[a]lthough the display of a dangerous weapon must occur *during the commission* of the offense of criminal sexual assault, it need not occur during sexual penetration" (emphasis in original)).

¶ 68    We further note that Illinois courts have upheld convictions for aggravated criminal sexual assault where the physical assault occurred close in time to the sexual assault. For example, in *People v. Colley*, 188 Ill. App. 3d 817, 820 (1989), the defendant stabbed the victim soon after the sexual acts were completed. In affirming the defendant's conviction, the appellate court stated that "we will not draw a bright line between the ending of the sexual acts and the bodily harm occurring afterward, as that would defeat the statutory purpose of protecting victims from sex offenders." *Id.* The appellate court in *People v. Thomas*, 234 Ill. App. 3d 819, 825 (1992), affirmed the defendant's conviction for aggravated criminal sexual assault, finding that the defendant burned the victim with a hot fork as "part of an unbroken series of events" which were "both very near in time and closely linked to the forced sexual acts." In *People v. Fryer*, 247 Ill. App. 3d 1051, 1058 (1993), the appellate court rejected the defendant's argument that the

injuries to the victim after the sex act could not be considered. The appellate court found that the physical injuries that the defendant inflicted on the victim "were sufficiently close to the sexual assault so that the injuries could be found to have been committed during the commission of the sexual assault." *Id.*

¶ 69 While defendant maintains that these cases predated *Giraud* and thus have limited value, this court has rejected such argument. *People v. Calderon*, 2022 IL App (2d) 200029-U, ¶ 47 (finding that "*Giraud* was concerned with the fact that no threat was communicated during the offense and the victim's life was not endangered during the offense," and thus concluding that *Giraud* was not "a limitation on the *Colley* line of cases that an aggravating circumstance may be close in time to the underlying offense"); *People v. Lewis*, 2025 IL App (1st) 231851-U, ¶¶ 40, 45 (rejecting the defendant's argument that *Giraud* overruled the *Colley* line of cases; finding that "the infliction of bodily harm may occur either before or after the sexual assault but must be sufficiently close in time and closely linked to the sexual acts for them to be considered as having been committed during the commission of the offense").

¶ 70 We are also unpersuaded by defendant's reliance on *People v. Singleton*, 217 Ill. App. 3d 675 (1991). In *Singleton*, the State argued the defendant's acts of domestic violence against the complainant and other relatives "throughout the years" created a real fear in the complainant's mind that her life was in danger when she refused to participate in sexual intercourse with the defendant and "he stated that he would kill her if she did not do as he asked." *Id.* at 687. The appellate court found that this was insufficient to sustain the defendant's conviction for aggravated criminal sexual assault, as the State was required to prove "overt acts by the defendant, and not verbal threats," which endangered and threatened the victim's life, and that the life-threatening acts occurred during the commission of the offense. *Id.* Unlike in *Singleton*,

the violent acts against P.Y. were not "remote in time from the sexual molestation charged." *Id.* Rather, the evidence indicated that the physical abuse of P.Y. was close in time to the act of sexual penetration and was part of a continuing pattern of force and violence, as evidenced by the old and new whipping marks on P.Y. at the time of her hospitalization in December 2020.

¶ 71    For the foregoing reasons, we reject defendant's alternative argument that the State failed to prove beyond a reasonable doubt that he used a dangerous weapon "during the commission" of the criminal sexual assault on December 25, 2020.  We turn to his next contention.

¶ 72                                *Count 15*

¶ 73    Defendant raises various challenges to his conviction for aggravated criminal sexual assault on December 27, 2020, under count 15.  Count 15 of the indictment alleged that defendant "knowingly committed an act of sexual penetration upon P.Y. to wit: contact between [defendant's] penis and P.Y.'s mouth, by the use of force or threat of force, and the criminal sexual assault was perpetrated during the course of the commission of any other felony, to wit: domestic battery."  See 720 ILCS 5/11-1.30(a)(4) (West 2020).  At trial, P.Y. testified that defendant forced her to perform oral sex and then hit her when she was not performing satisfactorily.  When asked whether defendant used the same objects P.Y. had previously described (*e.g.*, the cord), she responded in the affirmative.  The ASA also asked, "Did the defendant ever burn you?"  P.Y. testified that he burned her nipples with cigarettes on December 27, 2020.

¶ 74    On appeal, defendant advances the same arguments regarding P.Y.'s credibility issues which we addressed (and ultimately rejected) above.  He also contends that the State failed to prove beyond a reasonable doubt that he committed an act of sexual penetration, as the "only DNA corroboration was a single partial male DNA profile of three loci out of a possible 23."

20

Citing *People v. Wright*, 2012 IL App (1st) 073106, defendant maintains that there are "dangers" to drawing conclusions based on "such a small partial DNA profile." In reversing the defendant's conviction for aggravated criminal sexual assault and remanding for a new trial, the appellate court in *Wright* observed that the defendant was prosecuted almost entirely based on a cold-case DNA match. *Id.* ¶ 2. The defendant had received a life sentence, even though the victim could not identify him as the perpetrator and no other physical evidence linked him to the crime. *Id.* Defendant also relies on *People v. Watson*, 2012 IL App (2d) 091328, ¶ 32, wherein the appellate court concluded that defense counsel's failure to challenge partial-profile DNA comparisons constituted ineffective assistance. The appellate court observed that "the *only* evidence linking defendant to this crime (the seven-loci comparison) was uncorroborated and unchallenged." (Emphasis in original.) *Id.*

¶ 75    Defendant's reliance on *Wright* and *Watson* is misplaced. Unlike in those cases, defendant was not identified through a cold "hit" in a database; he was P.Y.'s live-in boyfriend. *E.g.*, *People v. Fountain*, 2016 IL App (1st) 131474, ¶ 49 (finding that the "facts and analysis in *Wright* are not pertinent to the instant case, which did not rely solely on the DNA evidence to identify an otherwise unknown offender"). Furthermore, despite his jailhouse calls in which he denied having sexual contact with P.Y. during the relevant timeframe, the DNA evidence—both as to her oral and vaginal swabs—suggested otherwise. Finally, we observe that defendant's arguments regarding the alleged weaknesses in the DNA evidence were presented to, considered, and apparently rejected by the trial court. *People v. Joiner*, 2018 IL App (1st) 150343, ¶ 63. We conclude that the trial court's finding is not so improbable or unsatisfactory as to justify a reasonable doubt as to defendant's guilt.

¶ 76    Defendant alternatively argues that the State failed to prove beyond a reasonable doubt

that he committed another felony during the commission of the sexual assault on December 27, 2020, "because there is no evidence of when he burned P.Y. with a cigarette," which was also the basis of his aggravated domestic battery conviction on count 23 (discussed below). The State contends, and we agree, that the "felony" referenced in count 15 was domestic battery, not the aggravated domestic battery which was the subject of count 23. A person commits domestic battery if he causes bodily harm to, or "[m]akes physical contact of an insulting or provoking nature with," any family or household member. 720 ILCS 5/12-3.2(a) (West 2020). While domestic battery generally is a Class A misdemeanor, it becomes a Class 4 felony if the defendant has a prior conviction for certain offenses, including domestic battery. See *People v. White*, 2015 IL App (1st) 131111, ¶ 35 (citing 720 ILCS 5/12-3.2(b) (West 2012)). As defendant had a prior domestic battery conviction, he could not be charged with anything less than the felony. See *People v. Sumler*, 2015 IL App (1st) 123381, ¶ 45.

¶ 77 P.Y. testified at trial that defendant forced her to perform oral sex on December 27, 2020, and then hit her when she was not performing to his satisfaction. For the reasons discussed above, viewing the evidence in the light most favorable to the State, we conclude that the evidence established that defendant committed a felony—domestic battery—during the commission of a sexual assault. We thus turn to defendant's final argument.

¶ 78                                   *Count 23*

¶ 79 Defendant was charged with having committed aggravated domestic battery on December 27, 2020, in that he "intentionally or knowingly caused permanent disfigurement to P.Y., to wit: [defendant] burned P.Y. about the body, and *** [defendant] and P.Y. have or have had a dating *** relationship." See 720 ILCS 5/12-3.3(a) (West 2020). Defendant contends that his conviction and sentence on count 23 must be vacated under the one-act, one-crime doctrine,

as the aggravated domestic battery under count 23 became a lesser-included offense on the count 15 aggravated criminal sexual assault.  As discussed below, we reject this contention.

¶ 80    Defendant concedes that he failed to preserve this issue for appeal.  See *People v. Hillier*, 237 Ill. 2d 539, 544 (2010) (noting that to preserve a claim of sentencing error, both a contemporaneous objection and a post-sentencing motion raising the issue are required).  Defendant maintains, however, that we may review his claim under the doctrine of plain error, which allows a reviewing court to consider unpreserved error when (1) a clear or obvious error occurs and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurs and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence.  *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007).  See also Ill. S. Ct. R. 615(a).  We agree with defendant that the second prong of plain error applies to his challenge.  See *People v. Coats*, 2018 IL 121926, ¶ 10.

¶ 81    The Illinois Supreme Court has held that when the State charges a defendant with multiple offenses which arise from a series of incidental or closely related acts—and the offenses are not, by definition, lesser included offenses—multiple convictions and sentences can be entered.  *People v. King*, 66 Ill. 2d 551, 566 (1977).  This is known as the one-act, one-crime doctrine.  *People v. Miller*, 238 Ill. 2d 161, 165 (2010).  The one-act, one-crime doctrine "prohibits convictions for multiple offenses that are based on precisely the same physical act."  *People v. Smith*, 2019 IL 123901, ¶ 13.  Whether a violation of the doctrine has occurred is a question of law, which we review *de novo*.  *Coats*, 2018 IL 121926, ¶ 12.

¶ 82    Defendant asserts that *People v. Gillespie*, 2014 IL App (4th) 121146, "speaks directly to

23

the situation in our case." The defendant in *Gillespie* was convicted of aggravated criminal sexual assault, with the aggravating element being that the "offense was 'perpetrated during the course of the commission *** of any other felony by the accused.' " *Id.* ¶ 13 (citing 720 ILCS 5/12-14(a)(4) (West 2010)). The defendant was found guilty and sentenced for both aggravated criminal sexual assault and robbery, which was the aggravating factor. *Id.* ¶ 7. As the robbery conviction was for the same robbery which was the predicate offense of the aggravated criminal sexual assault conviction, the appellate court held that the robbery conviction violated the one-act, one-crime doctrine, and vacated the robbery conviction. *Id.* ¶ 25. The appellate court noted that "[t]o hold otherwise and allow two separate convictions to stand for both the underlying felony and the aggravated criminal sexual assault, the defendant would be punished twice for the underlying offense, once for the offense and once for aggravating the criminal sexual assault." *Id.* ¶ 24.

¶ 83    The instant case is wholly distinguishable from *Gillespie*. The record in *Gillespie* was clear that the defendant's robbery conviction was for the same robbery that was the predicate offense of his aggravated criminal sexual assault conviction. Conversely, the same conduct—burning P.Y. about the body—was not used both to convict defendant of count 23 (aggravated battery) and to elevate count 15 to aggravated criminal sexual assault, as discussed above. We find no one-act, one-crime violation in this case.

¶ 84                                  CONCLUSION

¶ 85    For the reasons set forth herein, the judgment of the circuit court of Cook County is affirmed in its entirety.

¶ 86    Affirmed.